In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION

No. 1069, Docket 80-7079.

United States Court of Appeals, Second Circuit.

Argued May 1, 1980.

Decided Nov. 24, 1980.

Thomas E. Moseley, John C. Sabetta and Leonard Rivkin, New York City (Cadwalad-

er, Wickersham & Taft, Townley & Updike, New York City, Clark, Gagliardi & Miller, White Plains, N.Y., Kelley, Drye & Warren, New York City, and Rivkin, Leff & Sherman, Garden City, N.Y., on brief), for defendants–appellants.

Irving Like, Babylon, N.Y., and Victor John Yannacone, Jr., Patchogue, N.Y. (Edward F. Hayes, III and Malerba, Abruzzo, Clancy, Hayes, Downes & Frankel, Huntington, N.Y., Reilly & Like, Babylon, N.Y., W. Keith Kavenagh, Bayport, N.Y., Albert J. Fiorella, Mineola, N.Y., Yannacone & Yannacone, Patchogue, N.Y., Paul F. Corcoran, Mineola, N.Y., Aaron D. Twerski, Far Rockaway, N.Y., and Dorothy Thompson and Greenwald & Greenwald, Los Angeles, Cal., on brief), for plaintiffs–appellees.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

This appeal presents the question whether claims asserted by veterans of the United States armed forces against companies which supplied the United States government with chemicals that are alleged to have been contaminated and to have injured the veterans and their families, are governed by federal common law. Defendants–appellants Diamond Shamrock Corporation, Monsanto Company, Thompson–Hayward Chemical Company, Hercules Incorporated and the Dow Chemical Company were the manufacturers of various herbicides including "Agent Orange" (hereinafter collectively referred to as "Agent Orange") for use by the military as defoliants in the Vietnam War. The plaintiffs, veterans of that war and their families, allege that they have sustained various physical injuries by reason of the veterans' exposure to Agent Orange. Plaintiffs seek redress of those injuries under federal common law, and have invoked the "federal question" jurisdiction of the district court. 28 U.S.C.

§ 1331(a) (1976). Defendants contest the existence of a federal common law cause of action, and moved below to dismiss for lack of subject matter jurisdiction. The United States District Court for the Eastern District of New York, George C. Pratt, Judge, denied their motion. Defendants obtained certification of the jurisdiction issue and took this appeal pursuant to 28 U.S.C. § 1292(b) (1976).[1]

We agree with defendants that there is no federal common law right of action under the circumstances of this litigation. Accordingly, we reverse.

## I

The present litigation began in late 1978 and early 1979, when several individual veterans and their families commenced actions in the Northern District of Illinois and the Southern and Eastern Districts of New York, claiming injury from the veterans' exposure to Agent Orange and purporting to represent several classes of injured persons and persons allegedly "at risk" of injury. The plaintiffs in most of these actions were represented by the same attorney, who filed substantially identical complaints in all actions, naming the same defendant manufacturers. By order of the Judicial Panel on Multidistrict Litigation, thirteen such actions, involving thirty named plaintiffs, were transferred to the Eastern District of New York and assigned to Judge Pratt for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 (1976). Subsequently, additional actions were filed and were transferred to the Eastern District. It appears that there are presently more than 800 named plaintiffs in these proceedings.

After the transfer plaintiffs filed an amended complaint in the action that the district court had designated as the lead action for purposes of pretrial proceedings. Defendants moved to dismiss on various grounds, and by opinion dated August 14,

1. This Court granted defendants' motion for leave to appeal by order dated January 16, 1980.

1979, the district court dismissed a number of claims[2] and directed that a new complaint be filed. The second amended complaint was filed on August 20, 1979, asserting causes of action under the federal common law[3] and premising subject matter jurisdiction on 28 U.S.C. § 1331(a).[4] Defendants moved to dismiss for lack of subject matter jurisdiction. The motion was argued on October 3, 1979, and after argument but prior to decision plaintiffs proffered a third amended complaint. Defendants consented to the filing of the new complaint, and the district court, at the urging of the defendants, treated defendants' motion to dismiss as having been made with respect to that complaint. Accordingly, it is the third amended complaint (hereinafter sometimes referred to as the "Complaint") that is before us on this appeal.

## A. *The Third Amended Complaint*

The basic thrust of the Complaint is relatively simple: defendants manufactured a "phenoxy herbicide," Agent Orange, for use by the military in Vietnam. The herbicide was allegedly contaminated with certain toxic organic chemicals, including 2,3,7,8–tetrachlorodibenzo–p–dioxin ("dioxin"), which plaintiffs describe as "one of the most toxic substances ever developed by man." (Plaintiffs' Brief on Appeal at 2.) The plaintiff veterans assert that they were exposed to Agent Orange, and thus to the dioxin it contained, while serving in Vietnam. They claim to have sustained various physical injuries, or to be "at risk" of such injuries, by reason of that exposure. Plaintiffs seek relief on a number of theories, including strict product liability, negligence, and breach of warranty.

What marks these proceedings as somewhat extraordinary are the size of the plaintiff class and the scope of the relief that is sought. Plaintiffs purport to represent the 2.4 million veterans who served as combat soldiers in Southeast Asia from 1962 through 1971, as well as most of the families or survivors of those veterans. Fifteen plaintiff subclasses are identified; many of these subclasses consist of persons who are "at risk" of, but have yet to sustain, various physical injuries. Plaintiffs have alleged that "the combined liquid assets of the 'corporate defendants' will be insufficient to fully compensate the entire class of plaintiffs." (Complaint ¶ 15.) Plaintiffs therefore seek, in addition to unspecified damages,[5] a decree requiring defendants, upon a determination of liability, to establish

> a trust fund out of the current earnings of the defendants in the nature of a reserve against the claims of all the individual members of the plaintiff class to insure that the compensation of any group of individual plaintiffs will not impair the rights of those not before the Court at that time.

(Complaint ¶ 9.) Plaintiffs also seek a permanent injunction against further manufacture of Agent Orange.

---

**2.** These included a claim for injunctive relief against further manufacture of certain herbicides (which, the district court concluded, lay within the primary jurisdiction of the Environmental Protection Agency), as well as claims asserted under 42 U.S.C. § 1983 (1976) and various provisions of the antitrust and trademark laws.

**3.** Plaintiffs also sought to assert a cause of action under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 135 *et seq.* (1970) ("FIFRA"). The district court declined to infer such a cause of action for reasons we believe to be correct. *See* note 9 *infra.*

**4.** 28 U.S.C. § 1331(a) provides in part as follows:

> The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States . . . .

A cause of action which is founded on federal common law "arises under" the laws of the United States within the meaning of § 1331(a). *Illinois v. City of Milwaukee,* 406 U.S. 91, 99–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972); *Ivy Broadcasting Co. v. American Tel. & Tel. Co.,* 391 F.2d 486, 492 (2d Cir. 1968).

**5.** The third amended complaint alleges no specific *ad damnum.* The second amended complaint, however, asserted damages "in the range of $4 billion to $40 billion."

Defendants deny that there is any causal connection between exposure to Agent Orange and the injuries that plaintiffs claim to have sustained, and vigorously contest the propriety of the various remedial measures that plaintiffs seek to impose on them. This case, however, is still at the pleading stage, and for purposes of deciding the jurisdictional question before us, plaintiffs' factual allegations must be accepted as true.

## B. The Decision of the District Court

Plaintiffs argue that federal common law should be applied to their claims principally because of the unique federal nature of the relationship between the soldier and his government, relying chiefly on *United States v. Standard Oil Co.,* 332 U.S. 301, 305, 67 S.Ct. 1604, 1606, 91 L.Ed. 2067 (1947) ("Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces."). They contend that this interest brings the case within the doctrine of *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943), which held that, in order to ensure uniformity and certainty, "[t]he rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law." Plaintiffs argue that the government similarly has an interest in having all of its veterans compensated by government contractors who manufactured or marketed Agent Orange, and that application of the respective state laws would impede recovery on a uniform basis.

The district court rejected the contention that *Clearfield Trust* stated the controlling principle, recognizing that the United States, a party to *Clearfield Trust,* is not party to the plaintiffs' claims here.[6] Rather, the court recognized that since the

present action involves only private parties, the federal common law issue is controlled by the principles set forth in *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), and *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). After reviewing the latter decisions, the district court applied a three-factor test to determine whether federal common law governs plaintiffs' claims:

(1) the existence of a substantial federal interest in the outcome of a litigation; (2) the effect on this federal interest should state law be applied; and (3) the effect on state interests should state law be displaced by federal common law.

Slip op. at 17.

With respect to the first factor, the district court recognized two principal federal interests that may be affected by the present lawsuits: the federal government's interest in its relations with members of the armed forces, and its interest in its relations with suppliers of war materiel. As to the government's interest in the welfare of its veterans, the court stated that:

Soldiers serving in the armed forces are government charges, entitled to government protection. Torts committed by war contractors against soldiers in action constitute "harms inflicted" on the soldiers and "interference" with the relationship between soldiers and the government. Such harms and interferences implicate federal interests identified in [*United States v. Standard Oil, supra*].

*Id.* at 18. The court rejected defendants' contention that these interests were already protected by the Congressionally-enacted scheme of veterans' benefits, 38 U.S.C. § 310 *et seq.* (1976),[7] opining that

[t]he limited nature of compensation provided by 38 U.S.C. § 310 *et seq.* makes it

---

**6.** We note that the defendants have impleaded the United States in the present action. It is clear, however, that the jurisdiction of the district court over the claims of the plaintiffs is not enhanced by third party complaints. *Cf. Louisville & Nashville RR. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

**7.** 38 U.S.C. § 310 *et seq.,* entitled "Compensation for Service-Connected Disability or Death," establishes for veterans a basic entitlement to compensation from the government for injuries resulting from military service, and sets rates of compensation for specific types and degrees of disability. These provisions do not address issues of the liability of third parties to injured service personnel.

an insufficient guardian of the rights at stake in this litigation, *viz.* the rights of soldiers to be protected from "harms inflicted by others" and to be compensated for harms already inflicted. The existence and extent of these contested rights necessarily are intertwined with the relationship between government and soldier and thereby implicate federal interests. Slip op. at 18–19. Finally, the court reasoned that because of the large number of veterans claiming injury, and the large potential liability of the five defendants, the foregoing federal interests were "substantial" for purposes of the federal common law analysis:

> The estimated number of involved veterans ranges from thousands to millions, and the estimated potential liability of the five war contractors ranges from millions to billions of dollars. As the number of veterans and the size of the claims against the war contractors increase so the federal interest in this litigation expands.

*Id.* at 20.

As to the government's interest in its relations with its military suppliers–the court referred to a number of "speculative" ways in which lawsuits such as the present ones might adversely affect that interest, pointing out that in response to any increase in their potential liability, military suppliers might raise their prices, attach conditions to the use of their products, or stop dealing with the government altogether.[8] The court concluded that

> government relations with war contractors might well be drastically altered by changes in the rules governing liability of war contractors to soldiers for injuries caused by inherently "dangerous" war materials.

*Id.* at 19–20.

Turning to the second part of its test, the court found that the federal interest it had identified would be adversely affected if the issues in these lawsuits were adjudicated under state law:

> Application of varying state laws would burden federal interests by creating uncertainty as to the rights of both veterans and war contractors. It would also be unfair in that essentially similar claims, involving veterans and war contractors identically situated in all relevant respects, would be treated differently under different state laws.

*Id.* at 21.

Finally, as to the third part of its test, the court determined that application of federal common law would not have any significant adverse impact on state interests. While noting that "[t]ort claims are traditionally matters for state law, which has developed comprehensive substantive and procedural rules to govern them," *id.* at 22, the court distinguished the instant tort actions, finding that

> state law has not considered the complex question of a war contractor's liability to soldiers injured by toxic chemicals subject to federal regulation while engaged in combat and serving abroad.

*Id.* at 23. The court concluded:

> Because state law is no more or less developed as to such claims than federal common law, application of federal common law thereto would not significantly displace state law.

*Id.*

Having found substantial federal interests that would be adversely affected by application of state law to the instant claims, and having determined that there were no substantial state interests in having state law applied, the district court ruled that plaintiffs had stated valid causes of action under the federal common law.[9]

---

8. The court also noted that if defendants are eventually held liable for massive damages awards, the resulting blow to their financial health could have serious repercussions in the national economy.

9. The district court correctly determined that there is no private right of action under FIFRA, 7 U.S.C. § 135 *et seq.* (1970). The current statute is the result of two principal enact-

The court therefore held that it had subject matter jurisdiction over the case, and de-

ments: the original FIFRA, Pub.L.No.80-104, 61 Stat. 163 (1947) (codified at 7 U.S.C. §§ 135–135K (1976)), and the Federal Environmental Pesticide Control Act ("1972 Act"), Pub.L.No.92–516, 86 Stat. 973 (1972) (codified at 7 U.S.C. §§ 136–136y (1976)), which amended, and has now superseded, the original Act. *See* Pub.L.No.92–516, § 4(b), 86 Stat. 998 (1972). Following the four–pronged analysis set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), we conclude that neither enactment gives rise to a private right of action.

The four factors to be considered under *Cort v. Ash* are (1) whether the plaintiff is "one of the class for whose *especial* benefit the statute was enacted," (2) whether there is "any indication of legislative intent, explicit or. implicit, either to create such a remedy or to deny one," (3) whether a right of action would be "consistent with the underlying purposes of the legislative scheme," and (4) whether the cause of action is "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78, 95 S.Ct. at 2087.

As to the original FIFRA, which was in effect during the entire period that plaintiff veterans served in Vietnam, we see no essential satisfaction of any of the *Cort v. Ash* tests. First, there is no indication that the bill was enacted for the especial benefit of military men. It is clear that Congress's intent was to protect the public in general, with perhaps some special consideration for "agricultural producers and other users" of pesticides and rodenticides. *See* [1947] U.S.Code Cong.Serv. pp. 1200, 1202 (quoting the Report of the House of Representatives Committee on Agriculture). FIFRA makes no special mention of soldiers; and the House report, which states that the bill was considered by the United States Departments of Agriculture and the Interior, does not indicate that the bill was considered by any military or defense agency. *Id.* As to the second (and most important, *see Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980)) of the *Cort* factors, we see no clear indication of legislative intent to create a private remedy. Plaintiffs have cited no legislative history on this point, nor have they presented any detailed statutory analysis. The Act itself is primarily concerned with establishing an administrative scheme of labeling, registration and enforcement; there are indications that Congress expected that scheme to be the exclusive means of enforcement. *See* [1947] U.S.Code Cong.Serv. *supra*, at 1202. We conclude that this factor cuts against the plaintiffs. The third *Cort* factor is of little assistance here. While a private right of action might enhance enforcement of the Act's substantive provisions to some extent, it would also increase the bur-

nied defendants' motion to dismiss.[10] This appeal followed.

den on manufacturers (without commensurately increasing protection of *injured* persons who can recover damages under state product liability law), something which the administrative scheme of registration was specifically intended to avoid. *See* [1947] U.S.Code Cong.Serv., *supra* at 1202. Finally, the fourth *Cort* factor cuts strongly against the plaintiffs. The area of product liability has been "traditionally relegated to state law," and this is no less true of the products regulated by the FIFRA. *See, e. g., Muncy v. Magnolia Chemical Co.*, 437 S.W.2d 15 (Tex.Civ.App.1968). Thus, we conclude that the district court was correct in ruling that there is no private right of action under the original FIFRA.

As to the 1972 Act, the unavailability of a private right of action is even clearer. We find no more positive indications in the first, third and fourth *Cort* factors. More importantly, we find a negative indication as to the second *Cort* factor, *i.e.*, legislative intent, since Congress considered and explicitly rejected amendments that would have authorized citizen suits to enforce the 1972 Act's prohibitions. *See People for Environmental Progress v. Leisz*, 373 F.Supp. 589, 592 (C.D.Cal.1974) (discussing legislative history); *see also Kelly v. Butz*, 404 F.Supp. 925, 940 (W.D.Mich.1975). It is not for us to override that Congressional determination.

10. The court also denied defendants' motion to strike portions of the Complaint relating to plaintiffs' demand that defendants be required to establish a trust fund. The court premised the denial on its conclusion that

defendants are not prejudiced by allowing these requests for relief to remain in the [Complaint], since defendants have no obligation to admit or deny plaintiffs' requests for relief, which therefore place no pleading burden on defendants.

at 24. In addition, it appears that the court declined to rule on a motion to strike portions of the Complaint relating to class members who have not yet been injured, but are said to be merely "at risk" of injury by reason of a veteran's exposure to Agent Orange. Defendants argue here, as they have in moving for reargument below, that the district court should have granted both motions to strike. We decline to reach these questions. The district court, in granting certification under § 1292(b) was primarily concerned with the question of subject matter jurisdiction; the certification mentions only that issue. While we are not restricted by the district court's limited certification, *see Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 994–95 (2d Cir.), *cert. de-*

## II

Both plaintiffs and defendants accept the three–part test that the district court applied to the federal common law issue, and for purposes of discussion we accept that framework. But, focusing our consideration chiefly on the first factor of the test, *i.e.*, "the existence of a substantial federal interest in the outcome of the litigation," we disagree with the district court's analysis and conclude that the court gave insufficient weight to the Supreme Court's repeated admonition that

> [i]n deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a *significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown*
> . . . .

*Wallis v. Pan American Petroleum Corp., supra*, 384 U.S. at 68, 86 S.Ct. at 1304, *quoted with emphasis in Miree v. DeKalb County, supra*, 433 U.S. at 31, 97 S.Ct. at 2494. Principally we reject the district court's conclusion that there is an identifiable federal policy at stake in this litigation that warrants the creation of federal common law rules.[11]

In considering plaintiffs' contentions, it is essential to delineate precisely the relation of the United States to the claims here at issue. These claims are brought by former servicemen and their families against private manufacturers; they are not asserted by or against the United States, and they do not directly implicate the rights and duties of the United States. They are thus unlike the claims in *United States v. Standard Oil Co., supra*, in which the government brought suit to recover for its payments to a soldier injured as a result of the defendant's negligence, and *Clearfield Trust Co. v. United States, supra*, in which the government brought suit to enforce its rights in commercial paper issued by it. In each of those cases the government was a party seeking to enforce its own asserted rights, and analysis reveals two federal concerns which are inherent in such cases. First, the government has an interest in having uniform rules govern its rights and obligations. Second, the government has a substantive interest in the contents of those uniform rules. The first interest prizes uniformity for its own sake and is content–neutral; it does not dictate the substance of the federal common law rule to be applied. Thus, in *United States v. Standard Oil Co., supra*, the Court applied federal common law, recognizing the government's interest in uniformity, but refused to impose the liability argued for by the United States as the substance of that law.

The present litigation is fundamentally different from *Standard Oil* and *Clearfield Trust* with respect to both uniformity interest and substantive interest in the content of the rules to be applied. Since this litigation is between private parties and no substantial rights or duties of the government hinge on its outcome, there is no federal interest in uniformity for its own sake.[12]

---

nied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), and may review the entire order of the court below, *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658, 660 (2d Cir. 1974), we conclude that review now of the trust fund and "at risk" issues would be inappropriate. First, our ruling on subject matter jurisdiction may end the federal court litigation. (It is unclear whether any plaintiffs will seek to proceed on the basis of diversity jurisdiction.) More importantly, the district judge did not assess the merits of either motion to strike, and we note that he has reserved decision on defendants' motion for reargument of these questions, pending decision of this Court on the question of jurisdiction. In all, we think the wiser course is for this Court not to pass on them at this time.

**11.** Since we conclude that there is not now an identifiable federal policy, we need not reach the second and third factors of the test and speculate as to how state law, if it were already developed, would affect the federal policy if it were identifiable–or vice versa.

**12.** *Compare Bank of America Nat'l Trust & Sav. Ass'n v. Parnell*, 352 U.S. 29, 32–34, 77 S.Ct. 119, 120–121, 1 L.Ed.2d 93 (1956), private litigation involving the issues of whether certain government bonds were "overdue" and whether the defendant had taken title to the bonds in good faith. The Court observed that the question of when a government bond is overdue is a matter of federal law, but held that questions as to a party's good faith are left to local law.

*See e. g., Miree v. DeKalb County, supra,* 433 U.S. at 28, 97 S.Ct. at 2493. The fact that application of state law may produce a variety of results is of no moment. It is in the nature of a federal system that different states will apply different rules of law, based on their individual perceptions of what is in the best interests of their citizens. That alone is not grounds in private litigation for judicially creating an overriding federal law. Indeed, even where a federal statutory program governs the rights of private litigants and Congress has left gaps to be filled by the courts, uniformity is not prized for its own sake. For example, in *Auto Workers v. Hoosier Corp.,* 383 U.S. 696, 701–05, 86 S.Ct. 1107, 1110–1113, 16 L.Ed.2d 192 (1966), the Court dealt with a suit under § 301 of the National Labor Relations Act, 29 U.S.C. § 185 (1976), to which federal common law applied. Yet in determining the timeliness of such suits, the Court ruled that the appropriate state statutes of limitations should apply, and refused to impose a uniform federal period of limitations:

> [T]imeliness ... is clearly a federal question, for in § 301 suits the applicable law is "federal law, which the courts must fashion from the policy of our national labor laws." *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972.... We are urged instead [of referring to state laws,] to devise a uniform time limitation to close the statutory gap left by Congress. But the teaching of our cases does not require so bald a form of judicial innovation.

383 U.S. at 701, 86 S.Ct. at 1110. Thus, the prospect of uniformity is insufficient reason to invoke federal common law in private litigation; and if federal common law were invoked, it would not ensure uniformity since frequently that law takes its substance from local law.

The second fundamental difference between the present litigation and the *Clearfield Trust* type of case is that in the latter, the government's substantive interest in the litigation is essentially monothetic, in that it is concerned only with preserving the federal fisc, whereas here the government has two interests; and here the two interests have been placed in sharp contrast with one another. Thus, the government has an interest in the welfare of its veterans; they have given of themselves in the most fundamental way possible in the national interest. But the government also has an interest in the suppliers of its materiel; imposition, for example, of strict liability as contended for by plaintiffs would affect the government's ability to procure materiel without the exaction of significantly higher prices, or the attachment of onerous conditions, or the demand of indemnification or the like. As plaintiffs' counsel has observed, "this litigation will have a direct and lasting impact on the relationship between the federal government and war contractors ... and between the federal government and veterans." (Letter dated October 21, 1980, V. J. Yannacone, Jr. to A. D. Fusaro.) It is obvious that the government is interested. But unlike a simple uniformity interest, neither the government's interest in its veterans nor its interest in its suppliers is content–neutral. Each interest will be furthered only if the federal rule of law to be applied favors that particular group.

The extent to which either group *should* be favored, and its welfare deemed "paramount" (see dissent of Chief Judge Feinberg, *post*), is preeminently a policy determination of the sort reserved in the first instance for Congress. The welfare of veterans and that of military suppliers are clearly federal concerns which Congress should appropriately consider in setting policy for the governance of the nation, and it is properly left to Congress in the first instance to strike the balance between the conflicting interests of the veterans and the contractors, and thereby identify federal policy. Although Congress has turned its attention to the Agent Orange problem,[13] it

---

**13.** Congress has directed the Administrator of Veterans' Affairs to design and conduct an epidemiological study of veterans who were exposed to Agent Orange, and to report periodically to Congress until the study is completed.

has not determined what the federal policy is with respect to the reconciliation of these two competing interests. Thus, this case is unlike *Owens v. Haas*, 601 F.2d 1242 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), or *Ivy Broadcasting Co. v. American Tel. & Tel. Co.*, 391 F.2d 486 (2d Cir. 1968), in which the court was asked to supplement with federal common law a federal statutory program which itself embodied Congressional policy determinations.[14] In *Owens*, as Chief Judge Feinberg observes, *post*, the Court "discerned a 'federal regulatory scheme'" for the protection of prisoners. It is one thing to *discern* a federal regulatory scheme from the statutes Congress has enacted, as in *Owens*; it is another to *devise* such a scheme in the face of inaction by Congress. The dissent finds it anomalous that federal common law may apply to prisoners but not to veterans. We suggest that the anomaly lies not with the court in declining to devise a scheme, but with Congress which has made specific provision for protection of the government's prisoners but not for its soldiers.

We conclude that in the present case, while the federal government has obvious interests in the welfare of the parties to the litigation, its interest in the *outcome* of the litigation, *i.e.*, in how the parties' welfares should be balanced, is as yet undetermined.[15] The teaching of *Wallis* and *Miree* is that before federal common law rules should be fashioned, the use of state law must pose a threat to an "identifiable" federal policy. *Wallis v. Pan American Petroleum Corp., supra*, 384 U.S. at 68, 86 S.Ct. at 1304; *Miree v. DeKalb County, supra*, 433 U.S. at 31–33, 97 S.Ct. at 2494, 2495. In the present litigation the federal policy is not

yet identifiable. We conclude, therefore, that the district court erred in ruling that plaintiffs' claims were governed by federal common law. The order denying defendants' motion to dismiss for lack of subject matter jurisdiction is accordingly

*Reversed.*

FEINBERG, Chief Judge (dissenting):

This case presents us with a unique set of facts, parties, and pleadings. Many aspects of plaintiffs' case are troublesome, because plaintiffs seek unusual relief, both procedural and substantive, as to which I express no view. But the issue now before us is far narrower, and raises more familiar considerations. That issue is whether a federal district court has federal question jurisdiction over the action, see 28 U.S.C. § 1331(a), because the action arises under federal common law. I agree with District Judge Pratt that this case should be tried in federal court under rules of federal common law. I therefore dissent from the opinion of the majority.

That the present case is *sui generis*, and national in its proportions, is evident from the complaint itself. The defendants in this action are five of the largest chemical companies in the nation, all of which admittedly manufactured "Agent Orange," a defoliant, for use by our nation's armed forces in Vietnam between 1962 and 1971. Plaintiffs' suit is brought on behalf of veterans, living and dead, and their parents, wives, widows, orphans, and children, living, dead, and stillborn. Plaintiffs allege that the Agent Orange supplied by the defendants was "contaminated with ... polychlorinated dibenzo–$p$–dioxins ... and polychlorinated dibenzo furans ... including 2,3,7,8,–tetra–chloro dibenzo $p$–dioxin (... "Diox-

---

See Pub.L.No.96–151, 96th Cong., 1st Sess. (1979); 38 U.S.C. § 219 note (Supp.1980).

**14.** Plaintiffs contend that FIFRA (*see* note 9 *supra*) evinces a federal interest in regulation of herbicides sufficient to call into play the federal common law. But as this court has noted, FIFRA was not intended to preempt state law even with respect to those matters it specifically regulates. *Chemical Specialities Mfrs. Ass'n v. Lowery*, 452 F.2d 431 (2d Cir.

1971). It is certainly an insufficient basis for a displacement of the entire body of state product liability law.

**15.** The large number of veterans claimed in the class does not reveal the content of a federal policy reconciling the competing interests, any more than does the possibility that the defendant companies would have to be liquidated to pay the claims of the class.

in"), one of the most toxic substances ever developed by man." Plaintiffs further allege that as a result of exposure to Agent Orange, they incurred, or have suffered an increased risk of incurring, cancer, genetic damage, and an early death. Judge Pratt noted that the defendants are "facing aggregate claims which may eventually amount to billions of dollars." As the majority notes, the complaint identifies fifteen groups of plaintiffs, totalling over 800 plaintiffs who, we are told, have filed complaints in 25 judicial districts all across the country. By this time it is probable that 30 to 40 districts are affected, since additional plaintiffs appear daily; plaintiffs' counsel assures us that many more complaints would already have been filed, but for the request of Judge Pratt not to do so until the question of class certification has been resolved. How many plaintiffs will ultimately come forward is unclear. Present plaintiffs assert that as many as 2,400,000 men and women who served in the armed forces could be eligible to sue defendants—not to mention their parents, dependents, and dead or stillborn children. The national dimensions of the case as pleaded are too obvious to escape notice. Identical complaints have been filed, *inter alia*, in Massachusetts and California, in Illinois and Texas, and we are informed that the Judicial Panel on Multidistrict Litigation has ordered all Agent Orange cases consolidated before Judge Pratt. The plaintiffs in these cases complain of injuries sustained as the result of service in our nation's military, in a national endeavor in a foreign land. To the non–legal mind, it would be an odd proposition indeed that this litigation, so patently of national scope and concern, should not be tried in federal court.

As for the legal mind, all involved in this case—the parties, Judge Pratt, and the panel on appeal—appear to agree that federal question jurisdiction depends upon whether a federal common law rule of product liability should be applied. See *Illinois v. City of Milwaukee*, 406 U.S. 91, 98–101, 92 S.Ct. 1385, 1390–1391, 31 L.Ed.2d 712 (1972); *Ivy Broadcasting Company v. American Telephone and Telegraph Company*, 391 F.2d 486, 492–93 (2d Cir. 1968). Whether a federal rule should be applied, in turn, depends on three factors, as discerned in *Miree v. DeKalb County*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), and *Wallis v. Pan American Petroleum Corporation*, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966):

(1) the existence of a substantial federal interest in the outcome of the litigation;

(2) the effect on this federal interest should state law be applied; and

(3) the effect on state interests should state law be displaced by federal common law.

Judge Pratt, in his thorough and able opinion, analyzed all these factors and concluded that the fashioning of a federal common law rule was warranted on the facts of the present case. In a closely analogous case, *Owens v. Haas*, 601 F.2d 1242 (2d Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), this court recently arrived at the same result. *Owens* is instructive because it represents the most recent examination by this court of the "federal interest" doctrine discussed in *Miree* and *Wallis*. A review of the *Owens* facts and holding shows that Judge Pratt's analysis of the factors set forth above was correct.

In *Owens*, plaintiff was a federal prisoner who was injured by county jail officials who were working under contract with the federal government. Plaintiff sued for damages as, *inter alia*, a third–party beneficiary of that contract. On that theory, the "first question" before this court was whether plaintiff's claims were "a matter of federal law or of state law"; the question was posed "both as a guide to contract interpretation and as an alternate basis for jurisdiction in the district court." 601 F.2d at 1248. Writing for the panel, the late Judge Smith noted that "the federal government owes a duty of reasonable care to safeguard the security of prisoners under its control," and discerned a "federal regulatory scheme" for maintaining the health and well–being of such prisoners. *Id.* at 1249. Judge Smith then concluded that this regulatory scheme generated "a federal interest in assuring

uniform treatment of federal prisoners," *id.*, and that that interest, combined with the government's duty of reasonable care, meant that "federal rights and obligations [did] 'hinge on the outcome' of litigation in this area," *id.* at 1249–50. As a result, the court held that federal common law should apply.

Looking, as the *Owens* court did, to *Miree* and *Wallis*, the first question we must answer is whether the federal government has a "substantial interest" in the outcome of this litigation. It is plain that this question must be answered affirmatively. As the Supreme Court observed in *United States v. Standard Oil Company*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947),

> Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces. To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or non-federal governmental agencies, the scope, nature, legal incidents and consequences of the relation between persons in service and the government are fundamentally derived from federal sources and governed by federal authority. See *Tarble's Case*, 80 U.S. 397, 13 Wall. 397, 20 L.Ed. 597; *Kurtz v. Moffitt*, 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458. So also we think are interferences with that relationship such as the facts of this case involve. For, as the Federal Government has the exclusive power to establish and define the relationship by virtue of its military and other powers, equally clearly it has power in execution of the same functions to protect the relation once formed from harms inflicted by others.

*Id.* 332 U.S. at 305–06, 67 S.Ct. at 1606–1607 (footnotes omitted). This obviously federal relationship does not depend primarily upon any particular statute, but rather inheres in the federal government's exclusive capacity to wage war. But in the case before us this relationship can also be analyzed in terms of *Owens*. In *Owens*, the federal government was found to owe "a duty of reasonable care" to federal prisoners, a duty stemming from statutory enactment, specifically 18 U.S.C. § 4042.[1] Similarly, the federal government here is under a statutory obligation to provide "an improved and uniform program of medical ... care for members [of the uniformed services] and certain former members of those services, and for their dependents." 10 U.S.C. § 1071. Further, in *Owens* this court discerned in "the scheme of regulation of federal prisons [an indication of] congressional intent to provide some general protections for federal prisoners." 601 F.2d at 1249. Similarly, in the present case there is a statutory scheme to provide "general protections" for members and veterans of the uniformed services. See 10 U.S.C. §§ 1071–87 (program of medical care for members of uniformed services and dependents); 38 U.S.C. §§ 310–15 (schedule of compensation to veterans and dependents for wartime disabilities); §§ 321–22 (schedule of compensation to survivors of veterans for wartime death); §§ 331–35 (same, peacetime disabilities); §§ 341–42 (same, peacetime death); 50 U.S.C.App. § 454(a) (requiring adequate provision of shelter, sanitary facilities, water supplies, heating and lighting arrangements, medical care, and hospital accommodations before persons can be inducted into military service). See also the various regulations governing the welfare of soldiers, all of which are, of course, promulgated under authority granted by Congress. 10 U.S.C. § 121 (President's power to prescribe regulations); § 3012(g) (Secretary of Army's power to prescribe regulations).[2] The Secretary of the Army is re-

---

1. 18 U.S.C. § 4042 provides, in pertinent part, that the "Bureau of Prisons ... shall ... provide for the safekeeping, care, ... subsistence, ... [and] protection ... of all persons charged with or convicted of offenses against the United States ...."

2. E. g., Army Regulation 40–2, Army Medical Treatment Facilities, General Administration (effective April 1, 1978) (requiring provision of highest quality of patient care to soldiers in Army medical facilities); Army Regulation 40–3, Medical, Dental, and Veterinary Care (effective December 1, 1977) (providing standards of

quired by statute to be responsible for the "welfare, preparedness, and effectiveness of the Army." 10 U.S.C. § 3012(b)(1).

The majority concludes that on the facts of this case "there is no federal interest in uniformity for its own sake," and that there is no federal "substantive interest in the content of the rules to be applied." I disagree on both counts. As to uniformity of treatment, this court noted in *Owens* that "[b]ecause there is a federal regulatory scheme, there is a federal interest in assuring uniform treatment of federal prisoners." 601 F.2d at 1249. It is anomalous for this court to hold, on the one hand, that the federal government has an interest in "uniform treatment" of its *prisoners* sufficient to warrant the use of a federal rule of recovery, and, on the other hand, that the federal government has no such interest in "uniform treatment" of its *soldiers*. The majority suggests that the anomaly here lies "with Congress, which has made specific provisions for the protection of the government's prisoners but not for its soldiers." But a review of the statutory and regulatory provisions cited above, especially 10 U.S.C. §§ 1071–87 (medical care), § 3012(b)(1) (Secretary of Army's responsibility for "welfare" of Army personnel), and 38 U.S.C. §§ 310–15, 321–22, 331–35, 341–42 (veterans' and survivors' compensation), as well as myriad, detailed Army Regulations, demonstrates beyond doubt that Congress has made specific provisions for the protection of its soldiers, both directly and by delegation.

The majority also concludes that because the government has arguably conflicting substantive interests in the outcome of the litigation, "the federal policy is not yet identifiable." The allegedly conflicting federal interests are in the welfare of veterans and in the welfare of suppliers of war materiel. But that the plaintiff veterans and the defendant contractors have opposing interests in this litigation hardly means that the paramount federal interest is somehow divided or self–contradictory. The United States has a clear interest in the protection of its soldiers from harm caused by defective war materiel. What other interests does the United States arguably have that might conflict with this clear interest? One such interest might be in seeing that defendants, as suppliers of war materiel, are treated fairly. But that interest cannot be said to conflict with the government's interest in the safety of its soldiers. Another such interest might be in preventing defendants from being driven to bankruptcy by large damage awards to Agent Orange plaintiffs, who have already made claims assertedly greater than defendants' combined liquid assets. This, I take it, is what the majority means by its reference to the federal interest in the "welfare" of defendants. But this interest lies in the future, and in the realm of speculation. There will be time enough to deal with the potential impact of defendants' financial liability if and when they incur any, if it is truly in the interest of the United States to do so. By contrast, plaintiffs' injuries–assuming for the moment that plaintiffs have a viable cause of action–lie in large part in the present, and in the realm of the concrete. The conclusion seems inescapable to me that the United States' interest in the "welfare" of defendants cannot approach, either in magnitude or in quality, its interest in the welfare of the Agent Orange plaintiffs. In short, in the case before us the paramount interests of the United States are in the welfare of its veterans and in their fair and uniform treatment.

Having discerned a significant federal interest, we are next required to determine

---

policy, eligibility, treatment, and administration, inter alia, in Army medical facilities); Army Regulation 32–15, Clothing and Textile Materiel, Classification and Inspection (effective October 1, 1976) (providing minimal standards for serviceability of clothing of Army personnel); Army Regulation 210–16, Bachelor Housing Management (effective September 15, 1975) (providing minimal standards of adequa-

cy for quarters of certain Army personnel); Army Regulation 30–1, Army Food Service Program (effective July 1, 1977) (providing standards for food and food services for Army personnel); Army Regulation 28–1, Army Morale Support Activities (effective February 15, 1979) (providing programs for maintenance of morale, esprit, mental and physical fitness, and combat readiness of Army personnel).

whether or not a "significant conflict" exists between that interest and the application of state law. This factor is not reached by the majority. But that such a conflict does exist in the present case can hardly be disputed. Given the "distinctively federal" character of the relationship between the federal government and its soldiers, there is an inherent federal interest in the uniform definition of the aspects of that relationship involved in this case. As noted earlier, this inherent interest in uniformity was observed by this court in *Owens*, 601 F.2d at 1249. The application of state law to the present case would severely frustrate this federal interest: If state law is applied in the present litigation, and assuming again that the allegations in the complaint are true, then veterans may well be subjected to sharply differing rules of law in the pursuit of their remedies. For example, the law of the various states is in flux, diverging widely in the definition of what constitutes a "defective" product–especially with respect to defectively designed products–and in the availability of defenses based on the "state of the art" and technological feasibility. See United States Department of Commerce, Interagency Task Force on Product Liability, Product Liability: Final Report II–6–10 (1977) (varying state law respecting "defectiveness," especially in design–defect cases); *id.* at II–11–12 (same, respecting defense of "state of the art"). As a result, if the laws of 30 or 40 state jurisdictions are separately applied, veterans' recoveries for Agent Orange injuries will vary widely–despite the fact that these soldiers fought shoulder to shoulder, without regard to state citizenship, in a national endeavor abroad. In sum, the federal interest here in uniformity would be defeated by the application of discrete and differing state laws. It is thus not necessary to reach the question whether the other federal interest present in this case–in seeing that soldiers are not harmed by defective war materiel–would be frustrated by the application of state law. Because the federal interest in uniformity would be defeated by such an application, I conclude that the first two requirements of *Miree* and *Wallis*, as

interpreted by this court in *Owens*, are satisfied, as Judge Pratt concluded.

The third and last factor involves the extent to which state interests would be affected, if state law were to be "displaced" by federal common law in the present case. This factor is also not reached by the majority. I agree with Judge Pratt's conclusion that the claims made by plaintiffs in this unique and unprecedented litigation do not fall within the developed area of state tort law. As noted above, the states' product liability law is in flux; with respect to a case as novel as the one before us, a consistent and established body of state law is even less discernible. Accordingly, I think that Judge Pratt was correct in holding that the application of federal common law to the case before us would not "displace" state law, because there is no substantial body of state law on this point to be displaced. I thus conclude that all three factors, accepted by the majority as the proper analytical framework, point to the use of a federal common law rule in the present case, giving rise to federal question jurisdiction.

Because I conclude that the district court does have jurisdiction over the case before us, I dissent from the opinion of the majority.