504 A.2d 908

**Edward E. MACKEY, Appellant,**

v.

**MAREMONT CORPORATION, a Pennsylvania Corporation, Commonwealth of Pennsylvania and Pennsylvania National Guard, an Agency of the Commonwealth of Pennsylvania.**

Superior Court of Pennsylvania.

Argued March 19, 1985.

Filed Jan. 24, 1986.

418

Thomas L. Cooper, Pittsburgh, for appellant.

Louis C. Long, Pittsburgh, for appellees.

Before BROSKY, ROWLEY and FEENEY,* JJ.

BROSKY, Judge:

This appeal is from summary judgment in favor of appellee, Maremont Corporation, defendant in a defective design products liability suit.

* Honorable John M. Feeney, of the Court of Common Pleas of Allegheny County, Pennsylvania is sitting by designation.

The issue before us is the applicability under Pennsylvania law of the government contract defense to a strict products liability action.

The government contract defense has long been recognized in Pennsylvania tort law, but our appellate courts have not previously considered whether the defense also applies in products liability cases. We hold that the government contract defense is available in a strict products liability action under certain narrowly-defined circumstances.

Stipulations of the parties show that the nature of appellee's government contract justifies the protection of the government contract defense. Accordingly, summary judgment is affirmed.

### Facts and Procedural History

Appellee manufactures M60 machine guns under contract to the United States government. The M60 machine gun was designed by the United States government, and the design is and has always been the property of the United States. The parties have stipulated that appellee must (and does) manufacture the M60 to design and performance requirements established by the U.S. Army, and appellee has no leeway in changing any aspect of the design. All M60 machine guns produced by appellee are produced only for the government; appellee has no control over further distribution of the weapon and none are sold by appellee in the general stream of commerce.

Plaintiff (appellant herein), a Captain Edward Mackey in the Pennsylvania National Guard, was injured while attempting to disassemble an M60 manufactured by appellee. Captain Mackey alleges that his injury was caused by a design defect in the M60 machine gun he used during a training session conducted by the National Guard. He alleges that the M60 was manufactured by appellee and that therefore the manufacturer should be held strictly liable under Section 402A, Restatement of Torts (Second), as a supplier of a product which was defectively designed.

He does not allege that the particular M60 he used was defectively manufactured or that the M60 did not conform to Army specifications. Thus, for purposes of this appeal, we must assume that Captain Mackey's injury was caused by a design defect in an M60 machine gun manufactured by appellee in conformance with U.S. Army specifications.

Appellant additionally alleges that appellee is liable for failure to warn M60 users of the danger that the guide rod could discharge during assembly, causing precisely such an injury as occurred to him. Failure to warn the ultimate users of a product's hazards is a separate cause of action in Pennsylvania strict products liability law. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975); *Incollingo v. Ewing, et al.*, 444 Pa. 263, 287, 282 A.2d 206, 219 (1971); *Hammond v. International Harvester*, 691 F.2d 646 (3d.Cir.1982) (applying Pennsylvania law). However, the parties in this case have stipulated that all operating procedures of the M60 machine gun, including assembly and disassembly, have been established by the United States government. Thus, the government contract defense may be equally applicable to the claim of failure to warn as it is the claim of defective design.

### The Government Contract Defense in Pennsylvania Law

■ Pennsylvania recognizes an affirmative defense to actions for damages caused by a private contractor's performance of a government contract "where a contractor performs his work in accordance with the plans and specifications and is guilty of neither a negligent or willful tort." *Ference v. Booth & Flinn Co.*, 370 Pa. 400, 403, 88 A.2d 413, 414 (1952). Our Supreme Court explained two policy justifications for the government contract defense in upholding the *Ference* rule four years later. *Valley Forge Gardens, Inc. v. James D. Morrisey, Inc.*, 385 Pa. 477, 123 A.2d 888 (1956). First, the contractor should be shielded from liability when undertaking work for which the government itself would be privileged by sovereign immunity, so

long as the contractor does not commit a negligent or willful tort in its performance. This shield primarily serves to protect the government, for, if the contractor were not immune when it carefully complied, costs of possible damages from the engineering or planning decisions of the government itself would be spread back to the government, defeating the government's sovereign immunity. Second, the assurance of protection from suit for the damages consequential to the government's intended plan encourages lower costs to the government on competitive bids.

Both *Ference* and *Valley Gardens* involved claims in nuisance or trespass for property damage resulting from road contract work performance by private contractors to government specification. *Ference* treated a public nuisance claim by a bus company which suffered a loss of revenue when highway construction closed a nearby road which was essential to the bus line. In *Valley Forge Gardens*, run-off erosion from the highway construction embankment silted up the plaintiff's ponds. Neither case was premised on a theory of negligence in performing the government contract. The damages resulted from the engineering decisions made by the government, not from the manner of the execution of the contract. Thus, the government contract defense served to protect the contractor from traditional tort liability for damages caused by the government's engineering decisions.

However, our Commonwealth's Supreme Court has refused to apply the government contract defense when the plaintiff's damages are caused by the abnormally dangerous activities of the defendant contractor, such as by blasting. *Lobozzo v. Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432 (1970). The Court refused to extend the protection from suit which would have been available to the government had it performed the blasting itself because of the inherent nature of the cause of action. "If blasting, even though carefully performed, causes damage, it by that fact becomes 'tortious' and actionable, and one whose property is injured may have recovery." *Lobozzo*, 437 Pa. at 365, 263

A.2d at 435. Liability for damages to others must be expected occasionally by all who choose to engage in abnormally dangerous activities. It is an absolute liability tort, for which liability without fault is imposed. *Id.*

The reasons for the Court's refusal to extend the defense to claims arising from abnormally dangerous activities mirror the reasons for the recognition of absolute liability for abnormally dangerous activities. Blasting occasionally results in unpredictable and uncontrollable damage regardless of the care exercised. Hence, one who chooses to employ unusual *"abnormally"* dangerous activities is expected to bear the resulting costs, and the government planning such work expects that blasting victims will be compensated by the contractor.

In contrast, damages from trespass (*Valley Forge Gardens*) and nuisance (*Ference*) are more controllable through careful, non-negligent performance. Such damages are an unfortunate result of the government's discretionary decision to undertake the contracted work; and, when the contractor is blameless, the consequences must be borne, uncompensated, by the innocent victim.

> That the state itself may have proceeded wrongfully in not foreseeing the consequential damage to plaintiff's property and making provision for its compensation supports not at all the conclusion that either the highway commissioner or the defendant [contractor] has committed wrong in proceeding with the work in the only way it could be done. Having committed no wrong, defendant should not be subjected to liability. It is not saved by the state's immunity from suit, but by its own innocence of wrongful acts resulting in liability for tort.

*Valley Forge Gardens,* 385 Pa. at 890–891, 123 A.2d at 891 (citation omitted).

### The Government Contract Defense in Design Defect Cases

In federal law, the government contract defense derives from *Yearsley v. Ross Construction Co.,* 309 U.S. 18, 60

S.Ct. 413, 84 L.Ed. 554 (1940), where the Supreme Court found the defendant contractor not liable for erosion incident to a federal construction project on the Missouri River. The Court reasoned that the contractor should not be held liable for executing the government's will so long as the contractor had valid authority to perform the contract. 309 U.S. at 20–21, 60 S.Ct. at 414.

More recent suits against the United States Government and its contractors and suppliers have concerned servicemen injured by military equipment, forcing a development in the contours of the defense in light of *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) and *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). *Feres* bars suits against the federal government by injured servicemen or their survivors for damages from injuries suffered incident to military service, limiting them to veteran's benefits. *Stencel* extends this doctrine to bar indemnity actions by government contractors against the federal government for damages paid by such contractors to members of the military, or their dependents, for injuries suffered in the course of military service.

*Stencel* does not discuss the government contract defense, but presents a situation in which justice would appear to require the extension of the defense in the strict products liability context. Stencel Aero Engineering manufactured pilot emergency ejection equipment to Air Force specifications for installation in fighter aircraft manufactured by Rockwell North American. After the equipment had failed, resulting in pilot death, the company sought Air Force permission to install a design Stencel considered safer, but permission was refused. Instead, the Air Force instituted its own design changes, with which Stencel then complied. The pilot's widow and another pilot injured later during an emergency ejection won recovery against Stencel for defective design, but Stencel was denied indemnity against the United States Government which had insisted upon the design.

The Court explained that "to permit petitioner to proceed ... here would be to judicially admit at the back door that which has been legislatively turned away at the front door. *Stencel,* 431 U.S. at 673, 97 S.Ct. at 2054, 52 L.Ed.2d at 665. Judicial inquiry into government specifications would "involve second-guessing military orders, and would often require members of the armed services to testify in court as to each other's decisions and actions." The paramount interests of the United States government mandated that the contractor be granted no relief.

Recent leading opinions nationally on the government contract defense to design defects suits include *McKay v. Rockwell International Corp.,* 704 F.2d 444 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984) (admiralty); *In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y. 1982), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984) (state tort law); and *Brown v. Caterpillar Tractor Company,* 696 F.2d 246 (3d Cir.1982) *("Brown I"),* 741 F.2d 656 (3d Cir.1984) *("Brown II")* (Pennsylvania law). While the rules of law these cases establish are not binding upon us, an examination of their holdings is appropriate in arriving at our own conclusions.

## The McKay Formulation

Navy pilots Lieutenant Commander McKay and Lieutenant Carson were each killed during emergency ejections from fighter aircraft manufactured by Rockwell International under contract to the United States. Autopsies indicated that the two pilots were probably killed by injuries sustained during ejection. The Ninth Circuit in *McKay* reversed substantial recoveries which had been won by the decedents' estates on theories of products liability under Sections 388, 389 and 402A of the Restatement of Torts (Second). The Court extensively discussed the government contract defense in the context of a products liability suit against the supplier of military ordnance and remanded for

determination of the application of the government contract defense to defendant Rockwell International.

The Ninth Circuit propounded several reasons to extend the government's *Feres-Stencel* immunity to military suppliers in *McKay*. First, the government's immunity would be undermined by cost-spreading through contract price increases if military suppliers were not extended protection from suits for government contract design defects.

Second, the judiciary would be thrust into reviewing the decision-making process of the military if contractors were held liable for design defects created or approved by the government. Courts might also have to determine whether the use to which the service personnel had put the equipment constituted an abuse of the product (for which there would be no liability), even though the user was correctly carrying out direct military orders. Adjudication of the propriety of military commands would thus be unavoidable if abuse of the product were at issue. "Although judges must decide cases from fields of endeavor of which they know little, their otherwise omnicompetence confronts its limits in military matters. At this point ... separation of powers becomes a proper concern." *McKay* 704 F.2d at 449.

Third, contractors producing state-of-the-art equipment for military use often possess no negotiating leverage and are compelled by federal law to produce weapons of war under contracts of adhesion. "Exigencies of our defense effort ... push technology towards its limits and thereby incur risks beyond those that would be acceptable for consumer goods." 704 F.2d at 449–50.

Finally, a narrowly-circumscribed government contract defense provides incentives for the suppliers of military equipment to consult and collaborate with the government in the development and testing of equipment. 704 F.2d at 450.

The *McKay* court accepted the government contract defense in design defect cases for suppliers of military equipment under these circumstances:

(1) the United States is immune from liability under *Feres* and *Stencel;*

(2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment;

(3) the equipment conformed to those specifications; and

·(4) the supplier warned the United States about patent errors in the government's specifications or dangers involved in the use of the equipment that were known to the supplier but not to the United States.

704 F.2d at 451.

### The "Agent Orange" Formulation

■ American service personnel exposed to herbicides including dioxin ("Agent Orange") during defoliation of the jungles of Vietnam brought suit against the chemical manufacturers which had supplied the herbicides under contract to the United States, seeking recovery for personal injuries on theories including strict products liability for defective design and failure to warn of the hazards of exposure to the chemicals. *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980), *rev'd,* 635 F.2d 987 (2d Cir.1980), 534 F.Supp. 1046 (E.D.N.Y.1982), *("Agent Orange I"), cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).

The *Agent Orange* plaintiffs contended that the chemical companies possessed knowledge superior to the government's about the toxic properties of dioxin, and that, therefore, the companies should be liable for failure to warn of the hazards and should not be protected by the government contract defense, despite careful manufacture to specifications. Judge Pratt formulated the government contract defense in light of this claim, as follows:

A supplier ... has a duty to warn the military of known risks attendant to a particular weapon that it supplies, so as to provide the military with at least an opportunity fairly to balance the weapon's risks and benefits. . . .

[T]he court ... concludes that a defendant in this case will be entitled to judgment dismissing all claims against it based on that defendant's having supplied "Agent Orange" to the government pursuant to a contract, if the defendant proves:

(1) That the government established the specifications for "Agent Orange";

(2) That the "Agent Orange" manufactured by the defendant met the government's specifications in all material respects; and

(3) That the government knew as much or more than the defendant about the hazards to people that accompanied the use of "Agent Orange."[1]

*Agent Orange*, 534 F.Supp. at 1055.

### The Brown Formula

■ United States Army reservist Robert Brown sustained injuries allegedly caused by the defective design and inadequate warnings of a bulldozer manufactured by defendant Caterpillar Tractor Company for the Army. Brown sued under Pennsylvania law on theories including strict products liability for defective design and failure to warn. Caterpillar countered that it was insulated from suit by the government contract defense because it had built the bulldozer to Army specifications. *Brown I*, 696 F.2d at 246.

In *Brown I*, the Third Circuit reversed the District Court's grant of summary judgment in favor of Caterpillar, based on the government contract defense—finding that there were significant unresolved factual issues which precluded summary judgment. *Brown I*, 696 F.2d at 256. *Brown II* remanded the case for a new trial because the jury instructions on both defective design and adequacy of

---

1. It is only in the last of these requirements that we will depart from the *"Agent Orange"* holding. In our view, a comparison of relative degrees of knowledgeability of the government and the contractor is both abstract and difficult of proof. As such, we reject it as an unmanageable requirement. As will be seen, we are not rejecting the warning requirement, per se, only this comparative degree of knowledge which activates that duty.

warnings erroneously stated the elements of the government contract defense. *Brown II,* 741 F.2d at 661.

The Third Circuit held that, under Pennsylvania law, the government contract defense "places no greater obligation on a contractor than to execute the government's specifications 'carefully.'" *Brown I,* supra at 254.

The court found the *"Agent Orange"* approach to delineation of the elements of the government contract defense "attractive," and suggested that it might be "persuaded that a contractor must prove some element of compulsion [in following the allegedly defective specifications] in order to successfully raise the government contractor defense," were the court not "constrained by existing Pennsylvania law." *Brown I,* supra at 254.

Two additional recent federal district court decisions on the government contract defense to a strict products liability action apply Pennsylvania law: *Price v. Tempo, Inc.,* 603 F.Supp. 1359 (E.D.Pa.1985) (municipal firefighting gear); and *In re Air Crash Disaster at Mannheim, Germany,* 586 F.Supp. 711 (E.D.Pa.1984) revd. 769 F.2d 115 (3rd Cir.1985) (military equipment).

*Price v. Tempo, Inc.* illustrates the potential problems with the simple version of the government contract defense contained in the *Brown* decisions; that the contractor need only demonstrate careful compliance with the contract. Philadelphia city fire fighter David Price was seriously burned while wearing fire fighter's gloves and a coat manufactured by the defendants. Expert testimony on his behalf indicated that his injuries would have been avoided if the linings of the gear had been made of other materials. Defendants claimed that their products met the city's specifications, but plaintiffs countered that the city's specifications were written in reliance on representations made by the companies.

A critical problem in the *Price* decision is whether the companies shared their knowledge with the city so that the city could make an informed decision on the quality of the

gear it wished to purchase. *Price,* 603 F.Supp. at 1363. Another, allied, issue, is whether the defendant is able to establish "that the specifications for its product originated with the government." *Price,* quoting from *In re Air Crash Disaster at Mannheim, Germany,* 586 F.Supp. 711, 717 (E.D.Pa.1984). The Third Circuit was "particularly troubled by the scenario in which the specifications are skeletal, the contract is negotiated, and the contractor, knowing of a high risk of serious harm, fails to install a relatively inexpensive safety device." *Brown I,* 696 F.2d at 254. We, too, would be troubled by this scenario if we concluded, as the Third Circuit did, that the law in Pennsylvania compelled immunity for such a contractor. But we do not. Rather, that scenario is one in which the contractor should not be allowed the defense because the specifications which caused the plaintiff's injury were not the result of the government's discretionary decisions in making the contract.[2]

We join the Third Circuit in finding the *"Agent Orange"* formulation of the government contract defense "attractive," and also would consider some element of "compulsion" essential if there is a genuine issue concerning which party originated the design. However, we differ in that we do not consider this a departure from the present law in Pennsylvania. The government contract defense has always only protected contractors carrying out the discretionary decisions of the government from the damages caused by the government's own planning or engineering decisions. If the engineering decisions were made by the contractor,

**2.** Another related *caveat* appears in *Patraka v. Armco Steel Co.,* 495 F.Supp. 1013 (M.D.Pa.1980), applying Pennsylvania law to a personal injury suit claiming that the plaintiff's injuries were suffered as a result of defective engineering design in road construction. Careful compliance with government road contract specifications would not entitle the contractor to the government contract defense if the contractor "should reasonably have known that such specifications were inadequate for the segment of the interstate route along which the accident occured." *Patraka,* at 1020. Nor is the mere inspection and approval by the Highway Department during the course of work sufficient evidence that the government, in fact, set the specifications which resulted in the plaintiff's injury.

or if the government made the decisions without the benefit of the contractor's technical knowledge, then the contractor should not be protected.[3]

### The Duty to Warn of Post-Manufacture Defects

■ *Brown II* additionally discusses the effect of the government contract defense in a strict products liability action premised on the failure to warn. This type of warning is distinct from the pre-manufacture warning discussed above. In Pennsylvania, a duty to warn is non-delegable and runs to the ultimate user of the product, *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893 (1975) (plurality opinion), even if the user is a thief *Pegg v. General Motors Corp.*, 258 Pa.Super. 59, 391 A.2d 1074 (1978). *Brown II*, 741 F.2d at 659.

In the instant case, this fact raises the questions of whether appellee's duty to provide warnings (if there is such a duty under the facts of the case), (1) runs to each user of an M60 or (2) the duty is merely to warn the purchaser, the United States Army, or, (3) the government contract defense obviates the duty entirely where the United States Army contractually provides all instruction and training in the use of the M60 machine gun.

■ The military aspects of this case are critical to the determination of this issue. In the context of a municipal contract, the duty to warn (if present under the facts), would clearly run to the ultimate user of the product. *See, e.g. Hammond v. International Harvester, supra,* and *Brown II* at 659. However, separation of powers concerns compel the conclusion that this is not so in the military context.

■ Captain Mackey's complaint alleges that he received inadequate instructions or inadequate warnings about disassembling the M60. Assuming these allegations to be true, as we must in reviewing a motion for summary judgment,

---

**3.** The problem of collaborative design is informatively discussed by the Third Circuit in *Koutsoubos v. Boeing Vertol,* 755 F.2d 352 (Circuit 1985), applying federal law.

neither charge can be laid at the door of appellee under the facts stipulated. The United States Government originated the design of the M60 and provides all training in its use. Alleged inadequacies in the training Captain Mackey received from the Pennsylvania National Guard are not justiciable. The contract precludes Maremont providing instructions on the use of the M60. Thus, the government contract defense—in the military context—shields the contractor from liability for failure to providing instructions or warnings on the use of the product if the contract specifically provides that the military will provide instructions and training in the use of the product, and such training would have prevented the accident which caused the plaintiff's injury.

We hold, therefore, that the government contract defense in Pennsylvania entitles a strict products liability suit defendant to judgment dismissing all claims against it if it is established that:[4]

(1) The government established the specifications for the portion of the product which proximally caused the plaintiff's injury.

(2) The product met the government's specifications in all material aspects.[5]

(3) The defendant warned the government about patent errors or patent design defects in the government's specifications or about dangers involved in the design or use of the product that were known to or should have been known to the defendant.[6]

---

**4.** This formulation is meant to apply only to suppliers of our Armed Forces. A non-military context would present a different situation. See *infra*.

**5.** A non-material variation from design in the item's production would be one not causally related to the mishap giving rise to the lawsuit. The variation from specifications need not be the result of the manufacturer's negligence in order to establish his liability. As in other products liability contexts, he need only manufacture a product which is unreasonably dangerous.

**6.** As we already stated, the defense does not apply if the defendant is guilty of a negligent or willful tort with respect to the manufacture or distribution of the product.

(4) The defendant has provided any necessary instructions or warning unless the contract provides that the military will provide such instructions or warnings.

■■■ Turning now to the facts of the case before us, we find that the stipulations of the parties indicate that appellee has successfully shouldered the burden of proving the first element of the defense. The United States Government supplied the design of the M60 machine gun to appellee without appellee's participation in the design process.

The parties also have stipulated that the particular M60 which allegedly caused Captain Mackey's injuries met the government's specifications in all material aspects—satisfying the second element.

The third element of the defense listed above is satisfied in this case because appellee had no duty to inform the military about the operation of a weapon previously in use. In the military context, a supplier of weapons of war must not be asked to second-guess the requirements of the government—so long as the supplier provides the government with the information specified in element (3).

■■■ The fourth element is also met because there is no factual dispute that the instant contract provided that all training materials were the government's responsibility.

Accordingly, the grant of summary judgment in favor of defendant Maremont Corporation on the basis of the government contract defense is affirmed.

Judgment affirmed.

ROWLEY, J., concurs in the result.