1999 PA Super 21

**Bruce CONNER, Appellant,**

v.

**QUALITY COACH, INC. and Creative Controls, Inc. and Moss Rehab Driving School for disabled and Moss Rehab, Inc. and Albert Einstein Healthcare Network, Inc.**

Superior Court of Pennsylvania.

Argued Dec. 16, 1998.
Filed Jan. 26, 1999.

Joseph I. McDevitt, West Conshohocken, for appellant.

Frederick T. Lachat, Jr., Philadelphia, for Quality Coach, appellee.

* Retired Justice assigned to Superior Court.

1. Hereinafter we will refer to exhibits attached to the parties' motion for summary judgment and response as "D" for Defendant's Motion for Summary judgment and "P" for Plaintiff's Re-

Before JOHNSON and MONTEMURO*, JJ., and CIRILLO, President Judge Emeritus.

MONTEMURO, J.:

¶ 1 This is an appeal from an order granting summary judgment in favor of Appellee/Defendant, Quality Coach, Inc., based on the government contractor defense. For the following reasons, we affirm.

¶ 2 Appellant, Bruce Connor, suffered a spinal cord injury in 1968, which left him a quadriplegic; he has no use of his legs, and limited use of his arms and hands. For the last 20 years, Appellant has been driving a modified van. Prior to 1990, Appellant's van included two hand devices, one allowing him to steer with his right hand, and the other permitting him to brake and accelerate with his left hand using a forward and backward motion.

¶ 3 In the late 1980's, Appellant began to experience pain and discomfort in his neck, arm, shoulder and back which he attributed to the hand control device on his van. Therefore, he applied for funding from the Pennsylvania Office of Vocational Rehabilitation (OVR) for modifications to a new van. OVR referred him to Defendant Moss Rehab Driving School for Disabled for an evaluation, following which his evaluator, Dan Basore, recommended funding for, *inter alia,* a left hand control requiring a side-to-side motion to brake and accelerate, as opposed to the backward and forward motion of his previous control. (*See* Plaintiff's Response to Motion for Summary Judgment, Exhibit 18, Driver Evaluation/Training Center Van Equipment List at 2).[1] In addition, Basore recommended a hand securement device, specifically a "palmer cuff w[ith] D–Ring on velcro," (*id.*), so that Appellant could maintain his grip on the control. Basore did not specify where to place the velcro on the control.[2]

sponse to Motion for Summary Judgment, followed by the exhibit number or letter.

2. In his brief, Appellant describes the palmer cuff brake/throttle device as follows:

¶4 The OVR agreed to Moss' recommendations and invited bids on the work, accepting the bid submitted by Appellee Quality Coach. Appellee made the requested modifications to Appellant's van, including installation of the palmer cuff brake/throttle device, which was sold to Quality Coach by Defendant Creative Controls, Inc.

¶5 On August 10, 1994, four years after Appellant purchased the vehicle, a truck driving in front of his van came to a sudden stop. Fearing that an extension ladder protruding from the rear of the truck might strike his windshield, Appellant applied his brake by moving the hand control device to the right, and, at the same time, steered his van to the right. However, in doing so, Appellant hit the curb and the impact threw his body to the left. Because his left hand was secured in the palmer cuff device, he could not remove it; thus, his arm and hand moved to the left causing the van to accelerate. The van crashed into an automobile and a tree before coming to a halt. Appellant suffered serious injuries in the accident.

¶6 On September 29, 1995, Appellant filed a personal injury suit against Appellee, Moss Rehab Driving School for Disabled, Moss Rehab, Inc., Albert Einstein Healthcare Network, Inc., and Creative Controls, Inc. Appellee filed a motion for summary judgment in June 1997 claiming, *inter alia*, that it was entitled to government contractor immunity.[3] By Order dated July 31, 1997,

the trial court granted Appellee's motion. Appellant and all remaining defendants filed petitions for reconsideration which were later denied. The remaining defendants subsequently settled their claims with Appellant, and, by Order dated April 26, 1998, upon agreement of the remaining parties, the trial court entered a discontinuance. That Order also declared final and appealable the July 31, 1997 Order granting summary judgment in favor of Appellee.[4] This timely appeal follows.

¶7 Although Appellant lists nine issues in his Statement of Questions involved, he essentially challenges only the trial court's decision to grant Appellee's motion for summary judgment based on the government contractor defense. Specifically, Appellant contends that the trial court erred in:

(a) failing to hold Appellee to the proper burden by neglecting to consider:

(1) whether Appellee established that the government knew of the risk in securing Appellant's hand to the device; and

(2) whether Appellee established that it issued warnings and/or instructions regarding the use of the velcro strap;

(b) finding that the OVR issued specifications regarding the placement of the velcro strap on the palmer cuff brake/throttle device;

(Appellant's Brief at 9).

A Palmer cuff or "C" cuff is a flat rectangular piece of metal upon which someone such as the plaintiff could rest his left hand. The forward portion of this metal platform contained a metallic ring in the shape of the letter "C".... It is not completely closed, but open at the very top, thus causing it to look something like the letter "C". Typically, plaintiff's fingers would fit in the C ring allowing his palm and wrist to rest on the rear portion of the metallic platform. A person whose hand is in a Palmer cuff is not secured or tied into the device since he can remove his hand by simply pulling it back and out of the device.... The velcro strap attached to plaintiff's hand interface device, ... was attached around the rear portion of the Palmer cuff platform – the area upon which plaintiff's wrist would rest. Therefore, the velcro strap would fasten directly around plaintiff's wrist in a manner that would tightly secure his hand to the Palmer cuff and therefore to the brake/throttle mechanism.

3. Although the other defendants also filed motions for summary judgment, none of them raised this affirmative defense.

4. The July 31 Order granting Appellee's motion for summary judgment was not an appealable final order because it did not "dispose[] of all claims or of all parties." Pa.R.A.P. 341(b)(1) (1992). *See Smitley v. Holiday Rambler Corp.*, 707 A.2d 520, 524 (Pa.Super.1998)(stating that under Pa.R.A.P. 341, "an order granting summary judgment to several, but not all, defendants named in a civil complaint is not a final order unless the trial court expressly determines the order should be treated as such[; ... i]nstead, the partial grant of summary judgment only becomes final after entry of an order disposing of all claims or of all parties.").

(c) finding that Appellee was not involved in determining where the velcro strap would be placed on the brake/throttle device;

(d) finding that Appellant's expert objected only to the use of, rather than the placement of, the velcro strap; and

(e) concluding that Appellee was not negligent in selling and installing the modified strap without first consulting the manufacturer.

(*See* Appellant's Brief at 4–5).[5] After a thorough review of the record, the parties' briefs and the relevant caselaw, we find that the trial court properly granted summary judgment to Appellee based on the government contractor defense; accordingly, we affirm.

¶ 8 Pennsylvania Rule of Civil Procedure 1035.2 provides that any party may move for summary judgment in two circumstances:

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.Civ.P. 1035.2(1)-(2). Because summary judgment effectively ends the litigation, it should be granted only in the clearest cases. *Scopel v. Donegal Mut. Ins. Co.*, 698 A.2d 602, 605 (Pa.Super.1997). In reviewing an order granting summary judgment, "we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Ertel v. Patriot–News Co.*, 544 Pa. 93, 98–99, 674 A.2d 1038, 1041, *cert. denied*, 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996). We will reverse a trial court's order granting summary judgment only if we find that the court clearly abused its discretion or committed an error of law. *Cochran v. GAF Corp.*, 542 Pa. 210, 215, 666 A.2d 245, 248 (1995).

¶ 9 The trial court granted Appellee's motion for summary judgment based on the government contractor defense first recognized by the Pennsylvania Supreme Court in *Ference v. Booth & Flinn Co.*, 370 Pa. 400, 88 A.2d 413 (1952).

It is hornbook law that the immunity from suit of the sovereign state does not extend to independent contractors doing work for the state. **But it is equally true that where a contractor performs his work in accordance with the plans and specifications and is guilty of neither a negligent nor a willful tort, he is not liable for any damage that might result.**

*Id.* at 403, 88 A.2d at 414 (emphasis added) (holding defendant/contractor, hired by state highway department to construct road, not liable to plaintiff/bus company for nuisance; bus company had to detour route because construction of lower road rendered higher road impassable). *See also Valley Forge Gardens, Inc. v. James D. Morrissey, Inc.*, 385 Pa. 477, 123 A.2d 888 (1956) (holding

---

5. We note with disapproval that Appellant's brief violates Rules 2116 and 2117 of the Pennsylvania Rules of Appellate Procedure. Rule 2116(a) charges that the Statement of Questions Involved "should not normally exceed 15 lines [and] must never exceed one page ... [; t]his rule is to be considered in the highest degree mandatory, admitting no exception[.]" Pa.R.A.P. 2116(a). Contrary to the clear mandate of the Rule, Appellant's Statement of Questions Involved consists of 39 lines covering almost two full pages. In addition, Appellant's Statement of the Case, which should consist of "[a] closely condensed chronological statement, in narrative form, of all the facts which are necessary to be known in order to determine the points in controversy," Pa.R.A.P. 2117(a)(4), is a 13½ page narrative containing irrelevant details and argument. *See id.* at 2116(b) ("The statement of the case shall not contain any argument."). Although we decline to dismiss the appeal in this particular case, we warn Appellant and his counsel that conformance to the briefing requirements found in the Rules of Appellate Procedure is mandatory. Substantial non-compliance may result in quashal or dismissal of the appeal. *Id.* at 2101. *See First Lehigh Bank v. Haviland Grille, Inc.*, 704 A.2d 135, 138 n. 2 (Pa.Super.1997) (declining to dismiss appeal when appellant's statement of questions involved included 57 lines of type spanning two pages of brief; however, Court stated that "such indifference [to the Rules of Appellant Procedure] is worthy of admonishment.").

defendant/contractor, hired by state highway and bridge authority to construct road, not liable to plaintiff/cemetery for trespass; dirt and silt from roadwork washed into cemetery's ponds). *But see Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 263 A.2d 432 (1970) (holding government contractor defense not applicable when contractor engages in ultrahazardous activity, e.g., blasting).

■ ¶ 10　The government contractor defense protects two important interests: (1) it shields contractors from liability, absent a negligent or willful tort, when they perform work for the government for which the government is protected by sovereign immunity; and (2) it encourages lower competitive bidding, and thus lower costs for the government, by assuring contractors that they will be protected from lawsuits for consequential damages resulting from the government's plans. *Mackey v. Maremont Corp.*, 350 Pa.Super. · 415, 504 A.2d 908, 911 (Pa.Super.1986). *See also Carley v. Wheeled Coach*, 991 F.2d 1117, 1120 (3d Cir.1993), *cert. denied*, 510 U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993) (stating that "without the government contractor defense, it would be more difficult and costly for the government to acquire products.").[6]

¶ 11　At issue in the present case is the applicability of the defense in a non-military products liability action and the contractor's burden in proving this affirmative defense. In *Mackey v. Maremont Corp.*, *supra*, the only Pennsylvania case on point, a panel of this Court held that "the government contract defense is available in a strict products liability action under certain narrowly-defined circumstances." *Mackey*, 504 A.2d at

910.　Significantly, however, *Mackey* involved a contract with the military.[7]　After considering several federal court decisions, the *Mackey* court adopted a modified version of the government contract defense set forth in *In re "Agent Orange" Product Liability Litigation*, 534 F.Supp. 1046 (E.D.N.Y.1982), and held that a defendant must establish four elements to benefit from the defense in a products liability action:[8]

(1) The government established the specification for the portion of the product which proximally caused the plaintiff's injury.

(2) The product met the government's specifications in all material aspects.

(3) The defendant warned the government about patent errors or patent design defects in the government's specifications or about dangers involved in the design or use of the product that were known to or should have been known to the defendant.

(4) The defendant has provided any necessary instructions or warning unless the contract provides that the military will provide such instructions or warnings.

*Mackey*, 504 A.2d at 916 (footnotes omitted).[9] However, we specifically held that "[t]his formulation is meant to apply only to suppliers of our Armed Forces. A non-military context would present a different situation." *Id.* 504 A.2d at 916 n. 4.

■ ¶ 12　Appellant argues, first, that the government contractor defense is unavailable to non-military suppliers. He contends, however, that if we disagree with this premise, the restrictive test set forth in *Mackey*

6. Although we acknowledge that federal district and circuit court decisions are not binding on this Court, "an examination of their holdings is appropriate in arriving at our own conclusions." *Mackey*, 504 A.2d at 913. We find federal precedent especially enlightening in this area of law since Pennsylvania courts have rarely addressed the government contractor defense.

7. The defendant/contractor manufactured M60 machine guns for the United States Army. *Id.* 504 A.2d at 910.

8. The plaintiff in *Mackey*, as in the present case, premised his products liability claims on a design defect and failure to warn. *Id.* 504 A.2d at 910.

9. The first two elements outlined in *Mackey* are identical to those the district court adopted in *Agent Orange*. However, the *Agent Orange* Court required only one additional element: the defendant must prove "[t]hat the government knew as much or more than the defendant about the hazards to people that accompanied the use of 'Agent Orange.'" *Id.* 504 A.2d at 914 (quoting *Agent Orange*, 534 F.Supp. at 1055). The *Mackey* Court rejected this element as "abstract and difficult of proof." *Id.* 504 A.2d at 914 n. 1.

should apply. Conversely, Appellee argues that the government contractor defense is available to non-military contractors, but that the *Mackey* decision is specifically limited to military contractors; Appellee contends that "[t]he only requirements of a non-military contractor are that the government provide specifications, the contractor carefully follow the specifications and not act negligently." [10] (Appellee's Brief at 16). We hold that the government contractor defense is available to non-military suppliers in a state products liability action, but that to benefit from this defense, the contractor must prove that:

   (1) the government established specifications for the portion of the product which caused the plaintiff's injuries;

   (2) the product met the government's specifications in all material aspects; and

   (3) the contractor warned the end user of the product about any patent errors or patent design defects that were known to or should have been known to the contractor.

¶ 13 The *Mackey* Court limited its formulation to military contractors because it concluded that "separation of powers concerns compel the conclusion" that the contractor's duty to warn runs to the government, not to the end user, i.e. the military serviceman or officer. *Mackey*, 504 A.2d at 916. However, the Court stated that "[i]n the context of a municipal contract, the duty to warn ... would clearly run to the ultimate user of the product." *Id.* Therefore, our reformulation of the *Mackey* test, applicable to non-military contractors, requires that the contractor warn the end user of the product, rather than the government, of all applicable safety issues. Because under this schema the end user is made aware of patent design defects or other safety problems, we find that the

fourth requirement set forth in *Mackey* is unnecessary.

¶ 14 Moreover, we acknowledge that the *Mackey* Court specifically rejected that portion of the *Agent Orange* warning requirement which demands that the contractor prove the government knew as much as or more than the contractor about the hazards associated with the product; in *Mackey* we stated that "[i]n our view, a comparison of relative degrees of knowledgeability of the government and the contractor is both abstract and difficult of proof." *Mackey*, 504 A.2d at 914 n. 1. However, we find that evidence of the end user's knowledge of the defect or possible safety hazards is a relevant consideration. Clearly, it would be unfair to deprive a defendant of the government contractor defense in cases of failure to provide adequate warnings to the end user if the end user was already aware of the defect which caused his injury. This is consistent with Pennsylvania law in strict liability actions premised on a failure to warn. In all strict liability actions a plaintiff must prove both that the product at issue was sold in a defective condition and that the defect caused the plaintiff's injuries. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 131, 665 A.2d 1167, 1171 (1995). To establish the second element in a failure to warn case, "the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller." *Id.* Obviously, if a plaintiff was aware of the risk and disregarded it, he can not demonstrate that he would have avoided the risk had he been warned by the manufacturer or installer. Thus, although we will not require a defendant to prove the degree of knowledge held by the end user, we will consider the end user's knowledge of the defect or danger in determining whether the contractor should be deprived of the defense.[11]

---

**10.** This is the contractor's burden of proof applied by the Pennsylvania Supreme Court in both *Ference, supra,* and *Valley Forge Gardens, supra,* and applied by the trial court in the present case. On this point, for the reasons discussed *infra,* we agree with Appellant that the trial court erred by holding Appellee to an incorrect standard of proof.

**11.** We note that the Third Circuit has held that "the government contractor defense is available to nonmilitary contractors under federal common law." *Carley v. Wheeled Coach,* 991 F.2d at 1118. The *Carley* Court applied essentially the same test that we now adopt: (1) the United States approved reasonably precise specifications; (2) the product manufactured by the defendant conformed to those specifications; and (3) the defendant warned the United States about

¶ 15 In the present case, Appellant argues that Appellee failed to establish each element of the defense. Under our revised formulation, to gain immunity under the government contractor defense, Appellee must first prove that the government established specifications for the portion of the product that caused the plaintiff's injuries. Appellant "submits that the specific design features [sic] that causes the product to be defective is the manner in which the velcro strap was installed along the rear portion of the Palmer cuff so that it was to be wrapped around [Appellant's] left wrist. In short, by wrapping the velcro strap around [Appellant's] wrist, [Appellant's] hand was so secured into the Palmer cuff that he could not remove it quickly when an emergency situation occurred on August 10, 1994." (Appellant's Brief at 26). Appellant contends that Appellee, not OVR, determined where the velcro strap would be placed.

¶ 16 Predicting Pennsylvania law, the Third Circuit has held that "the government contractor defense is available despite the contractor's participation in development of the design, so long as the government has approved the design after a substantial review of the specifications." *In re Air Crash Disaster at Mannheim Germany*, 769 F.2d 115, 122–23 (3d Cir.1985), *cert. denied sub nom.*, *Eschler v. Boeing Co.*, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986). However, "where a specification originates with the contractor, the defendant must prove that the government actually considered the particular specification and decided to make it a part of the plans or design for the project." *Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1217 (3d Cir.1989). In *Koutsoubos v. Boeing Vertol*, 755 F.2d 352 (3d Cir.1985), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985), the Court explained the reasoning behind this rationale:

> [I]f any involvement by the contractor would defeat the defense, there would be no incentive for contractors to work closely

the dangers in the use of the product that *were known to the defendant but not to the United States. Id.* at 1125–26 (emphasis added). *See also Price v. Tempo, Inc.*, 603 F.Supp. 1359 (E.D.Pa.1985)(finding government contractor de-

with the military; on the other hand, where there is no government participation in the preparation of the specifications the rationales for the defense do not apply. *Id.* at 355.

¶ 17 We agree with this reasoning and find that a contractor may participate, to some extent, in establishing the specifications for the product at issue without defeating the government contractor defense; however, "[w]hen the government does not consider the pros and cons of a particular specification but 'approves' it in form only, then the contractor, not the government, makes the effective choice." *Beaver Valley*, 883 F.2d at 1217.

¶ 18 Here, OVR's bid invitation called for, *inter alia,*

> (10) Vacuum-assisted gas and brake with backup (E.2.4), left side placement, control with side-to-side operation, with palmar [sic] cuff and D-ring on velcro (Contact driver evaluator Dan Basore if more details are required.)

⁂　　⁂　　⁂

(P–19, Office of Vocational Rehabilitation, Bid Invitation at 2). As Appellant emphasizes, the bid invitation did not specify where the velcro strap should be placed. Indeed, Appellee concedes that it "may have, arguably, had some discretion in the initial placement of the velcro strap[.]" (Appellee's Brief at 13). However, Appellee contends, and we agree, that the Moss Driving Evaluator, Dan Basore, made the final determination of where the strap would be placed. Basore testified during his deposition that although both he and Appellant were aware of the possible safety issues involved in strapping Appellant's hand to the control, he made a conscious choice to include the velcro strap with D-ring in the modifications.

Q. The additional item that you're saying that Bruce requested was the Velcro strap?

fense applicable in products liability action; however, applying *Agent Orange* elements, court held defendants did not meet burden of proof necessary to grant summary judgment).

A. Yes.

Q. In that case it was there anyway?

A. Mine went across the top of the C. We had one there – mine came across the top, over top of the C-clamp, which we used throughout training. He asked for something additional here.

Q. Now when you gave the recommendation on your evaluation for a palmar [sic] cuff with D-ring on Velcro, were you recommending the Velcro strap over the D-ring or the Velcro strap over his hand?

A. I wanted them to know that I wanted a Velcro strap with a D-ring available and then I wanted them to discuss with their 37–year–old client where to put it, where he is comfortable with it. I wasn't sure who they were going to use, so I left it that way. Then Bruce would be able to tell them where he's comfortable.

**Again, I'll see the van when it's done. If it was in the wrong spot or he didn't like it, no big deal. We'll change it.**

(P–33, Pretrial Examination of Dan Basore at 89–90) (emphasis added). Indeed, after the modifications were completed, Basore conducted five driving sessions with Appellant, each lasting 1½ to 2½ hours. *See* D–L, Pretrial Examination of Dan Basore at 98–102. Moreover, Basore testified that he considered the fact that the velcro strap he recommended would prevent Appellant from quickly removing his hand from the palmer cuff in the case of an emergency. However, "[w]eighing that against the fact that [Appellant] liked having it there and it felt more stable, [Appellant] was more comfortable having that there." (P–40, Pretrial Examination of Dan Basore at 93). Therefore, it is clear that OVR's approval of the placement of the velcro strap across Appellant's hand was "more than a mere rubber stamp," *Air Crash*, 769 F.2d at 122; Basore considered the safety problems, but chose to secure Appellant's hand to the palmer cuff.[12]

¶ 19 Next, Appellee must establish that it met the government's specifications in all material aspects. This element, however, is not disputed. Appellant's challenge focuses on his contention that Appellee, not OVR, determined the placement of the velcro strap. Because we have concluded that the government, in the person of Basore, determined where the strap would be placed, Appellant's argument fails.

¶ 20 Lastly, under our revised test, Appellee must prove that it warned the end user of the product, in this case Appellant, about patent errors or defects that were known to or should have been known to Appellee. First, Appellee contends that it was unaware of the design defect, and thus, cannot be held liable. However, Appellant's expert, Michael Shipp, opined that in the field of driver rehabilitation or evaluation, generally accepted industry practices "include consulting a manufacturer on the use and application of a product...." (P–26, Supplemental Written Report of Expert Testimony at 2). Because the manufacturer, Creative Controls, did not design the palmer cuff with a velcro strap to secure the user's hand, "[t]he addition of the Velcro strap[ ] constitutes a modification of the product, and the manufacturer should have been consulted on the matter." (*Id.*). Thus, Appellant has established, through expert testimony, a genuine issue of material fact as to whether Appellee should have known of the design

---

12. In his Reply Brief, Appellant argues that Moss was an independent contractor of OVR; therefore, we should not impute the knowledge of Moss' employees, specifically Basore, to OVR. We believe it is clear, however, that Moss was an agent of OVR. "An agency relationship is created where there is a manifestation by the principal that a person shall act for him, the person accepts the undertaking, and the parties understand that the principal is in control of the undertaking." *Refuse Management Sys. v. Consol. Recycling Sys.*, 448 Pa.Super. 402, 671 A.2d 1140, 1147 (Pa.Super.1996). It is undisputed that Appellant originally contacted OVR to request government funding for his van modifications. OVR then referred Appellant to the Moss Driving School for a driving evaluation. Following the evaluation, Moss recommended van modifications to OVR. OVR then approved the recommendations, and invited bids. In fact, on the bid invitation, OVR noted that any questions regarding the palmer cuff device should be directed to Basore. Therefore, it is clear that, as to Appellee, Moss was the agent of OVR.

defect.[13]

¶ 21 However, assuming that Appellee was aware or should have been aware of the defect, we find that its failure to provide warnings is irrelevant since Appellant himself was clearly cognizant of the safety issues implicated by securing his hand in the velcro strap. Basore testified in his deposition that during Appellant's training, he utilized a palmer cuff with a velcro strap that came across the top of the "C", but that Appellant "asked for something additional[.]" (P–33, Pretrial Examination of Dan Basore at 89). Moreover, Basore testified that he and Appellant specifically discussed the safety hazards of strapping Appellant's hand to the palmer cuff.

Q. Did you ever consider the possibility when you were recommending the palmar [sic] cuff with a Velcro strap with a D-ring that Mr. Conner may be in a driving situation where he would have to remove his hand from the brake/throttle mechanism very quickly and the D-ring on Velcro strap would prevent him from doing so?

A. Oh, yes.

Q. What consideration did you give?

A. **Well, we talked about that and he realized that he would have to be stopped to get his hand out of there. Probably it's going to be more difficult to get his hand out with the D-ring. Weighing that against the fact that he liked having it there and it felt more stable, he was more comfortable having that there.** Secondly, that's why we switched to turn signals that were mounted for his elbow, so he wouldn't have to get out of the hand control quickly and go to the column-mounted turn signals. That's why we did that.

Q. What was Mr. Conner's response to this? Did he express any concern about there being a problem?

A. No.

(P–40, Pretrial Examination of Dan Basore at 92–94) (emphasis added). Indeed, in his deposition, Appellant acknowledged his awareness that his hand would be secured to the brake/throttle device.

Q. Was this the first time you had operated a van with some kind of device used to secure your hand to the throttle?

A. Yes.

Q. Did you discuss that with Mr. Basore?

A. Did I discuss the securement of my hand?

Q. Right; the reasoning for it or why that was there on the van or why it was different from what you had before?

A. **There was probably some discussion about it. I don't recall the nature of it.**

Q. Do you have an recollection of Mr. Basore or anybody else from Moss explaining to you what the reason for that devise was, the securement device?

A. It was somehow made obvious that I couldn't control a throttle brake without having it fastened to the device somehow.

Q. Was that because of the side to side method, if you know?

A. Part of the reason was because it was a different movement?

Q. What was the reason?

A. It was different than the hand control that I had been using, and I couldn't maintain a grip on it.

(P–39, Appellant's Deposition at 57–58) (emphasis added). Therefore, Appellant and Basore discussed the safety hazards associated with securing Appellant's hand to the palmer cuff, but discounted them. Accordingly, in this case, Appellee's failure to provide warn-

---

13. We agree with Appellant that the trial court abused its discretion in concluding that "Mr. Shipp's objection is with the *use* of the Velcro straps to secure Plaintiff's left hand to the servo control device, not with the *placement* of the Velcro straps on the palmer cuff." (Trial Ct. Op. at 8) (emphasis original). Shipp opined that the "manner in which plaintiff's hand was secured to the brake/accelerator control device was defective in that it prevented the release of the operator's hand from the device...." (P–14, Written Report of Expert Testimony at 2). At the very least, it is unclear whether Shipp objected to the use of any velcro strap or simply a strap that secured the driver's hand.

ings does not defeat its government contractor defense.

¶ 22 Finally, Appellant contends that the trial court erred in concluding that Appellee was not negligent in installing the velcro strap on the palmer cuff device without first consulting the manufacturer, Creative Controls. Indeed, the president of Creative Controls, Thomas Stowers, testified in his deposition that the company does not sell a D-ring on velcro attachment for its palmer cuff like the one utilized by Appellant. He further explained,

> we never cared to have the Servo [hand control] used in such a manner that you're actually strapped in and can't get out ... [it is] more comfortable, more convenient for the client to be able to slip his hand in, slip out, and if – I've always looked at it as a safer method. If you can do it that way, then you do it without being strapped in.

(P–42, Pretrial Examination of Thomas R. Stowers at 78–79).

¶ 23 "To establish a cause of action in negligence, the plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Martin v. Evans*, 551 Pa. 496, 501, 711 A.2d 458, 461 (1998). Even if we conclude, based on the expert report of Michael Shipp, that Appellee had a duty to consult with the manufacturer before it placed the velcro strap in a position other than that advertised by the manufacturer, and that it breached that duty by failing to consult with Creative Controls, Appellant has failed to demonstrate how this breach caused his injuries. Based on both Basore's pretrial examination, and Appellant's own admissions, it is clear that Appellant knew the dangers involved in securing his hand to the brake/accelerator device, and chose to disregard them. Thus, Appellant has not alleged, let alone proven, that additional warnings by either Appellee or Creative Controls would have affected his decision.

¶ 24 Order affirmed.